UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:10-cr-68 |
| v. | ) | |
| | ) | *Collier / Lee* |
| | ) | |
| CHARLES J. BOWMAN | ) | |

## REPORT AND RECOMMENDATION

Before the Court is the motion of Defendant Charles J. Bowman to suppress contraband found during a traffic stop and statements he made while in police custody [Doc. 23].[1] Defendant was stopped for speeding, and during the stop, methamphetamine residue and related contraband were found in his vehicle during a search. Defendant was arrested, and he gave incriminating statements during a custodial interview. Defendant argues his consent to search, Miranda waiver, and statements were involuntary due to his intoxication. After considering the evidence and argument, I **RECOMMEND** that Defendant's motion to suppress [Doc. 23] be **DENIED**.

## I.    BACKGROUND

At the hearing, the Government offered the testimony of Jeffrey Graham, a patrol officer of the New Hope Police Department ("Graham"), and Chad Johnson, a detective with the Marion County Sheriff's Department assigned to the Bureau of Alcohol, Tobacco, and Explosives' task force ("Johnson"). Defendant offered his own testimony and the testimony of his grandfather, mother, sister, and cousin.

---

[1] The motion was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. 24]. The Government filed a response in opposition [Doc. 29]. An evidentiary hearing was held on November 5, 2010, and the Government submitted a post-hearing brief [Doc.34].

**A. Officer Graham's Testimony**

Graham testified as follows: At 10:10 p.m. on the evening of January 2, 2010, he observed a vehicle traveling toward him on a stretch of State Highway 156. Graham activated his radar and confirmed the vehicle was traveling in excess of the posted 55 mile-per-hour speed limit. Graham pulled the vehicle over. It was a windy and cold night, and as Graham approached the car, the wind blew the odor of chemicals from Defendant's vehicle to him. Graham has worked at 30 or more sites where methamphetamine labs were found and has stopped three vehicles containing mobile methamphetamine labs. As a result of his experience with methamphetamine labs, Graham recognized the odor emanating from Defendant's vehicle as being associated with the production of methamphetamine. Because of the odor, Graham asked Defendant whether he had been in any trouble with methamphetamine before. Defendant answered affirmatively.

Graham also asked Defendant, the driver, for his license, registration, and proof of insurance, which Defendant provided. As Graham returned to the patrol car to check Defendant's paperwork, he noticed several items in the backseat and floor of Defendant's vehicle in plain view: a gallon of Coleman fuel, coffee filters, and a mason jar. Graham knew from experience that these items were often used in the manufacture of methamphetamine. Defendant's license was valid, and Graham returned to Defendant's car. He asked Defendant whether there was anything illegal in the car, and Defendant replied there was not and added that Graham was free to search if he wanted to. Graham did not ask Defendant for permission to search; Defendant volunteered it. Defendant stepped out of the car, again without first being asked, and Graham patted him down. Defendant was not handcuffed.

Graham searched the car and located (1) the partly empty can of fuel, (2) an opened box of

2

coffee filters, (3) the mason jar, which was covered in plastic secured by black electrical tape, (4) some lithium batteries, which Graham knew to be used in the "shake and bake" method of manufacturing methamphetamine, and (5) several damp coffee filters with a white powdery residue, indicating they had recently been used to make methamphetamine. A field test of the residue was positive for methamphetamine. Graham called the Marion County Sheriff's Office and asked that they notify the task force officer and the New Hope Police Chief.

Out of a concern for his own safety and Defendant's safety, Graham monitored Defendant's demeanor and reactions during the search. Graham acknowledged that the recent production of methamphetamine could have indicated Defendant was using methamphetamine, and that the fumes associated with making methamphetamine can themselves have an intoxicant effect. Defendant did not appear to be intoxicated, however, and Graham did not believe it was necessary to conduct a field sobriety test on Defendant. Defendant was willing to answer questions; he was standing still rather than pacing back and forth; he was not "off balance"; his eyes were not glassy or "bouncing around"; his speech was not slurred; and he knew where he was going. Defendant told Graham he was on his way to his girlfriend's house to eat. In Graham's experience, all of these observations, including an appetite to eat, were inconsistent with methamphetamine intoxication.

At some point during the traffic stop, Graham asked for permission to make a phone call. Graham did not recall whether Defendant made the phone call or not, but said he would have been free to do so if he had a cell phone because he was not handcuffed.

After other officers arrived, Defendant was transported to a jail cell at the Marion County Justice Center. Graham was present during an interview of Defendant conducted by Johnson in an interview room at the Justice Center shortly after midnight, at which Defendant was willing to

3

answer questions.  Before the interview commenced, Defendant asked to speak to Gene Hargas, another detective with whom Defendant had some prior experience, instead of Johnson.

Graham completed an affidavit of complaint for Defendant's arrest and a police report of the incident.  In neither document did he mention that he smelled the odor of methamphetamine or methamphetamine-related chemicals before he searched the car.  He did mention the items he saw in the car.  Graham explained that he had limited space in which to detail his observations, and he thought he had probable cause to search the vehicle based on his plain-view observations alone.

### B.    Detective Johnson's Testimony

Johnson testified as follows:  He arrived at the scene of the stop after Defendant had already been transported to the Justice Center.  The items that were taken from Defendant's car were on the trunk, and Johnson also recognized them as being consistent with the manufacture of methamphetamine.  Johnson and Graham went to the Justice Center, where they asked the jailers to bring Defendant to an interview room.  Defendant had been in the general population of the jail, not the "drunk tank," indicating that the booking officer did not believe Defendant was intoxicated when he was booked.

Defendant sat down with Johnson and Graham in the interview room, a ten by twelve room with a table and chairs and a single filing cabinet.  Defendant was not handcuffed.  Johnson's weapon was holstered on his ankle, and Graham's weapon was holstered on his duty belt. Defendant had some prior experience with law enforcement, with a previous methamphetamine conviction and another conviction for aggravated assault.  Defendant recalled Johnson from a 2004 incident, which they joked about briefly before Johnson read Defendant a Miranda "Advice of Rights and Waiver" form.

The Miranda rights and waiver form[2] has two sections: a statement of rights and a waiver. Johnson read the former aloud and asked Defendant whether he understood his rights. Defendant replied that he did. Johnson then read the waiver section, which states:

> I have read this statement of my rights or it has been read to me, and I understand these rights. At this time I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

Johnson then asked Defendant whether he understood the waiver, and Defendant replied he did. Johnson also asked Defendant whether he was able to read and write, and Defendant replied he could. Johnson gave Defendant the form and gave him an opportunity to read it for himself, and Defendant signed the form and printed his name. Defendant was cooperative, and at no time did Johnson make any promises or threats to induce Defendant's cooperation.

Johnson did not ask Defendant if he was intoxicated or had taken any drugs, but Defendant did not appear to be intoxicated. In Johnson's estimation, Defendant was cooperative and in good humor. He was responsive to Johnson's questions, even volunteering information beyond the questions asked. He did not slur his speech, and he made eye contact with Johnson. During the interview, Defendant gave detailed information about his activities that evening. He told Johnson he had been making methamphetamine because he needed money "to keep a roof over his head." He described where he had been making methamphetamine and helped pinpoint the location on a map drawn by Johnson. Defendant also provided additional information concerning his purchase of pseudoephedrine that was consistent with information in the database that tracks such purchases,

---

[2] The form, bearing a signature Defendant later authenticated as his own, was admitted without objection as Government's Exhibit 1.

a printout of which Johnson had with him during the interview.  Finally, Defendant helped draw a map to a residence and Johnson was later able to find that residence based on Defendant's directions.  At the conclusion of the interview, Johnson gave Defendant his telephone number written on the corner of a piece of paper in case Defendant wanted to communicate with him further.  Several days later, Defendant did in fact contact Johnson.

### C.    Dudley Rector's Testimony

Dudley Rector ("Rector"), Defendant's grandfather, testified as follows: On the evening in question, January 2, 2010, sometime between 8:00 and 10:00 p.m., Rector received a call from Defendant.  Rector believed Defendant was "drunk or drugged up" because Defendant did not make sense.  He received another call at 1:30 or 2:00 a.m. on January 3, from Defendant from the jail.  At that time, too, Rector stated that Defendant sounded "crazy, like a drunk, drugged up."  Rector had observed Defendant in an intoxicated state on one or two previous occasions.

### D.    Margaret Smith's Testimony

Margaret Smith ("Smith"), Defendant's mother, testified that she spoke to Defendant on the telephone at 2:00 or 3:00 p.m. on the afternoon of January 2, prior to the traffic stop.  She told him she was glad he had not gotten into trouble the night before (New Year's).  Although Defendant told her that he was okay, she believed he was not.  In Smith's words, Defendant was "tore out of his frame."  She did not see Defendant until the evening of January 4, after he had been released from jail.  At that time, she stated that she could tell he had been "out there," but he was "starting to come down."

### E.    Amanda Wilson's Testimony

Amanda Wilson ("Wilson"), Defendant's sister, was present at Defendant's bond hearing

on the morning of January 4, and she drove him home around lunchtime that day. Wilson stated

Defendant was "out there" and "delusional" at that time. She testified that "every five minutes, he

was asking where he was."

### F.     Todd Graham's Testimony

Todd Graham, Defendant's cousin, was also incarcerated in the Marion County jail when

Defendant was arrested. He saw Defendant across a hallway through a window, and he stated that

Defendant did not recognize him, even though they have known each other throughout their lives.

They could not hear each other, but Graham gestured to Defendant in order to ask him why he had

been arrested. Defendant shrugged and mouthed the words, "I don't know you."

### G.     Defendant's Testimony

Defendant testified as follows: He did not recall much about the evening of January 2, but

remembered that he had been using methamphetamine and Xanax earlier that day. At that time, he

was typically using about one and a half grams of methamphetamine "just to get started," and as

much as five grams per day. He had first used methamphetamine at the age of 16, and he was 25

at the time of his arrest. He did not remember making any phone calls that day and he did not

remember the traffic stop or the interview with law enforcement officers, but he recognized his

signature on the waiver form. He did remember the Monday morning bond hearing when the judge

explained his state charges.

## II.     ANALYSIS

### A.     Search of the Vehicle

Defendant acknowledged at the hearing that Graham's testimony regarding the events of the

traffic stop and vehicle search was unrebutted as Defendant had no recall of the events at issue. He

questioned, however, Graham's failure to note the presence of an odor of methamphetamine in the paperwork concerning the stop and arrest. While Graham did not include his observations about the methamphetamine odor emanating from Defendant's vehicle in his affidavit or police report, his omission does not mean he did not smell the odor. An officer's otherwise credible, consistent, and unequivocal testimony that he smelled the odor of narcotics should not ordinarily be overcome by negative inference. *See*, *e.g.*, *United States v. Freeman*, 2010 WL 4244268, at *8-9 (6th Cir. 2010). In *Freeman*, the officer testified he smelled marijuana at the suspect's vehicle, but on the video recording of the traffic stop, the officer did not mention that smell. The court held that "[t]he fact that [the officer] said nothing about the odor does not mean that he did not, in fact, smell marijuana." *Id.* Here, similarly, the fact that Graham did not mention the odor of methamphetamine in his report does not mean that he did not, in fact, smell methamphetamine or methamphetamine-related chemicals. I therefore credit Graham's testimony regarding the methamphetamine odor in full.

Given Graham's credible testimony, I **CONCLUDE** the search of Defendant's vehicle was supported by probable cause.[3] Defendant does not dispute he was properly stopped for speeding. After the stop, Graham almost immediately developed an independent and reasonable suspicion that Defendant was involved in criminal activity when he smelled the odor of methamphetamine. *See Freeman*, 2010 WL 4244268, at *8 (odor of marijuana created reasonable suspicion justifying 23-minute extension of traffic stop to wait for drug dog). That suspicion was corroborated by

---

[3] Although I credit Graham's testimony that Defendant voluntarily consented to the search of his vehicle, it is not necessary to rely on consent here because Graham had probable cause to search the car. Although Defendant's grandfather testified Defendant did not make sense to him during a telephone call on the night of the traffic stop, Graham's detailed and unrebutted testimony portrays a person capable of voluntary consent as addressed further below. *See United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010) (explaining that consent to search and validity of Miranda waiver inquiries "overlap" where the suspect's capacity is at issue).

Defendant's admission he had previously been in trouble with methamphetamine and by Graham's observations of the fuel can, coffee filters, and jar, which Graham knew in his experience to be associated with methamphetamine production. At that point, even if the odor of methamphetamine alone did not create probable cause to believe the vehicle contained evidence of a crime,[4] all these facts together certainly established probable cause. *See United States v. Moxley*, 2000 WL 1234320, at *3 (6th Cir. 2000) (unpublished) (smell of marijuana combined with officer's visual observation of marijuana residue created probable cause). With probable cause, Graham was entitled to conduct a warrantless search of the vehicle for evidence of criminal activity. *Arizona v. Gant*, 129 S. Ct. 1710, 1721 (2009).

**B. Statements Given During Custodial Interview**

Defendant also seeks suppression of his incriminating statements, arguing that, due to his intoxication, he did not freely and voluntarily waive his right to counsel before speaking with the officers. Specifically, Defendant argues that Graham and Johnson should have known he lacked the capacity to validly waive his rights and should have inquired into his mental state. The controlling law is well settled: a defendant may relinquish his Miranda rights (1) if the waiver is voluntary—i.e., "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) if it was knowing and intelligent—i.e., "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado*

---

[4] The Sixth Circuit and this Court have consistently held that the smell of marijuana, by itself, is sufficient to establish probable cause to search a vehicle. *United States v. Bohanon*, 629 F. Supp. 2d 802, 809 (E.D. Tenn. 2009) (*citing United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004) and *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993)). Defendant has offered no argument why the odor of methamphetamine, as opposed to marijuana, would be any less likely to support a prudent officer's reasonable belief that a vehicle contains evidence of a crime. It is not necessary to belabor this point, however, given the ample probable cause and consent to search.

9

*v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

### 1. Voluntary

In assessing whether a confession was made voluntarily, a court must determine, in the totality of the circumstances, whether the confession was the product of the defendant's unconstrained free will. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973). The government bears the burden to prove that the confession was voluntary by a preponderance of the evidence. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999); *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.1992).

Although a defendant's intoxication may be a factor in the voluntariness inquiry, "[e]vidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). As the Supreme Court has explained, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986) (indicating that if the defendant's state of mind makes him susceptible to coercion, a lesser degree of coercive conduct may render the confession involuntary, but explaining that "mere examination of the [defendant]'s state of mind can never conclude the due process inquiry."). Thus, police do not act coercively by conducting an interview with an intoxicated defendant unless they know of the defendant's weakened mental state and choose to exploit it. *See United States v. Treadwell*, 11 F. App'x 502, 511 (6th Cir. 2001).

Here, even if Defendant was intoxicated, I **FIND** no evidence that Graham or Johnson took

advantage of his weakened mental state.  Graham and Johnson each credibly testified he did not

make any threat or promise to Defendant, and both officers described Defendant as cooperative.

Johnson, in particular, recounted that Defendant recalled him and even "joked" about a prior

incident with him, then gave information beyond what was asked for with details that were

confirmed.  In addition, nothing about the interview room or the officers' appearances is suggestive

of coercion.  Defendant was not handcuffed, and no weapons were drawn.  While the government

bears the burden of proof to show that a waiver of Miranda rights was voluntary, the defendant must

first point to some evidence of improper police activity.  *See United States v. Gatewood*, 230 F.3d

186, 193 (6th Cir. 2000) (admitting confession where defendant "failed to advance any evidence of

coercive police activity").  Defendant has shown no such evidence here, and I **CONCLUDE** his

statements were voluntary.

### 2.    Knowing and Intelligent

The Miranda warnings "ensure that a waiver of . . . rights is knowing and intelligent by

requiring that the suspect be fully advised of [those] rights, including the critical advice that

whatever he chooses to say may be used as evidence against him."  *Spring*, 479 U.S. at 574.  To

determine whether a defendant understood his rights, courts examine the totality of the

circumstances, including the suspect's age, experience, education, background, intelligence, and,

especially pertinent here, intoxication.[5]  *See United States v. Montgomery*, 621 F.3d 568, 573 (6th

Cir. 2010).  Even if made while intoxicated, however, a Miranda waiver will be considered knowing

and intelligent if the defendant remains "alert, coherent, and lucid."  *Id.* (*quoting United States v.*

---

[5] At the age of 25, and with prior experience with law enforcement, Defendant has not argued
that any of these factors (except intoxication) indicate he did not understand his rights.

*Dunn*, 269 F. App'x 567, 573 (6th Cir. 2008)). In *Montgomery*, the Sixth Circuit Court of Appeals found a defendant's waiver to be knowing and intelligent when the defendant was receiving morphine intravenously after being shot. *Id.* at 570. Similarly, in *Dunn*, a case relied on by Defendant, the court found the defendant's waiver to be knowing and intelligent when the defendant was under the influence of marijuana "every day," including when he spoke with police. 269 F. App'x at 572. And in *United States v. Soto*, 124 F. App'x 956, 963 (6th Cir. 2005), another case relied on by Defendant, a defendant who claimed he was high on marijuana was nonetheless found to have validly waived his Miranda rights because he "did not appear to be under the influence of alcohol or drugs" at the time of his arrest.

I **FIND**, based on the officers' credible testimony, that Defendant was alert, coherent, and lucid at the time he made his incriminating statements. Defendant has presented his own testimony and the testimony of his family members to suggest he was using drugs and intoxicated on the night of his arrest and interview. The accounts of Graham and Johnson, however, were consistent and credible, and they portray a person able and willing to converse with law enforcement. At the scene of the traffic stop and at the Justice Center, Defendant's speech was not slurred and his answers were responsive to the officers' questions. At the stop, Defendant was standing still, and his eyes were not glassy or bouncing around. During the interview, he gave detailed answers which Johnson was able to corroborate: his description of his pseudoephedrine purchases were consistent with state database records, and Johnson was able to follow his directions to locate an address. Furthermore, although Defendant claims he has no recollection of the interview, he kept Johnson's number and called him several days later. It is possible that Defendant's relatives, who know Defendant closely, might have believed him to be intoxicated on the night of his arrest and in the ensuing days, but

there is no evidence that Defendant failed to understand his rights or the consequences of

relinquishing them or evidence of improper police activity. Accordingly, I **CONCLUDE** Defendant

knowingly and intelligently waived his Miranda rights.

## III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[6] that Defendant's motion to suppress [Doc.

23] be **DENIED**.[7]

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[6] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

[7] This document contains hyperlinks to other documents. Such links are provided for the user's convenience only, and the Court does not guarantee their functionality or accuracy. Any link which directs the user to a document other than the document cited in the text will not supersede the textual citation. The Court does not endorse the content of, or any provider of, any document maintained by any other public or private organization.