UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No: 1:10-CR-68 |
| v. ) | |
| ) | |
| CHARLES J. BOWMAN ) | Chief Judge Curtis L. Collier |
| ) | |

**MEMORANDUM**

Before the Court is Defendant Charles Bowman's ("Defendant") motion to suppress evidence obtained as the result of a traffic stop and statements made by Defendant to law enforcement following his arrest (Court File No. 23). The Court referred the motion to United States Magistrate Judge Susan K. Lee pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) (Court File No. 24). Judge Lee held an evidentiary hearing on the matter on November 5, 2010 and after a supplemental filing by the government (Court File No. 34), issued a Report and Recommendation ("R&R") on the motion (Court File No. 36). Defendant filed objections to the R&R within the given fourteen days (Court File No. 37), to which the government responded (Court File No. 38). For the following reasons, the Court will **ACCEPT** and **ADOPT** the R&R (Court File No. 36) and will **DENY** Defendant's motion to suppress (Court File No. 23).

I.      **RELEVANT FACTS**

Neither party challenges the Magistrate Judge's account of the testimony and evidence presented at the hearing, which the Court hereby adopts by reference (Court File No. 36, pp. 1-7). The Court will only set forth the facts necessary to this Memorandum. Defendant was pulled over for exceeding the 55 mile- per- hour speed limit  by Officer Jeffery Graham of the New Hope,

Tennessee, Police Department ("Graham") at about 10:00 p.m. on January 2, 2010. Defendant testified he had no recollection of this traffic stop and concedes Graham's testimony regarding probable cause for the stop is unrebutted (Court File No. 37, p. 2). Graham describes the night as windy and stated as he approached the car, he detected an odor emanating from Defendant's vehicle, which he associated with the production of methamphetamine. Graham indicated he had previously worked at least 30 sites where methamphetamine labs were discovered and had stopped three vehicles containing mobile methamphetamine labs. Graham asked Defendant if he had been in trouble with methamphetamine before and Defendant answered in the affirmative.

While he was walking back to the patrol car to check Defendant's license, registration, and proof of insurance, Graham noticed the following items in the backseat and on the floor of Defendant's vehicle in plain view: a gallon of Coleman fuel, coffee filters, and a mason jar. His experience informed him that these items are commonly used in the manufacture of methamphetamine. Graham returned Defendant's paperwork and valid license and asked Defendant if there was anything illegal in the car. Defendant answered in the negative and informed Graham he was free to search if he wanted to. In addition to the items in plain view were some lithium batteries and several damp coffee filters with a white powdery residue. Graham also noted the mason jar that he had seen was covered in plastic secured by black electrical tape. A field test showed the residue as positive for methamphetamine. At this point, Graham called the Marion County Sheriff's Office and asked them to notify the task force officer and New Hope Police Chief.

Throughout the stop, Graham observed Defendant closely out of concern for his and Defendant's safety and determined it was not necessary to conduct a field sobriety test. Graham noted his willingness to answer questions, his lack of slurred speech, his ability to stand still and

2

avoid pacing, his balance, his eye contact, and knowledge of where he was going. Defendant explained he was on his way to his girlfriend's home to eat and his apparent appetite further supported Graham's conclusion Defendant was not intoxicated on methamphetamine. During the traffic stop, Defendant asked to make a phone call and Graham did not recall if Defendant actually made the call or not. Defendant was not handcuffed and had exited the vehicle after telling Graham he was free to search the vehicle.

Once the other officers arrived, Defendant was arrested and taken to a cell at the Marion County Justice Center. Detective Chad Johnson ("Johnson") testified he arrived at the scene of the traffic stop shortly after Defendant had been taken to the Justice Center. Johnson observed the items taken from Defendant's car and also recognized the items as consistent with the manufacture of methamphetamine. Once Johnson and Graham arrived at the Justice Center, they directed the jailers to bring Defendant to an interview room. Defendant had not been placed in the "drunk tank" upon arrival but instead was put in the general population by the booking officer.

Graham testified Defendant asked to speak to another detective, Gene Hargas, with whom he had prior experience instead of Johnson. Johnson described joking with Defendant about a 2004 incident as Defendant recognized him. Defendant had some prior experiences with law enforcement from a previous methamphetamine conviction and a conviction for aggravated assault. Johnson describes reading Defendant his *Miranda* rights from an "Advice of Rights and Waiver" form and asking Defendant if he understood his rights. Defendant indicated to Johnson he understood his rights and, after Johnson read the waiver section of this form, he understood the waiver. After acknowledging his ability to read and write, Defendant read the form for himself and signed and printed his name at the bottom (Court File No. 33-1). The waiver section is immediately below the

3

list of the required *Miranda* rights and reads as follows:

> I have read this statement of my rights or it has been read to me, and I understand these rights. At this time I am willing to answer questions without a lawyer present. No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

(*Id.*).

Defendant was not handcuffed during this interview. Both Johnson and Graham had weapons- Johnson's was holstered on his ankle and Graham's was holstered on his belt. Johnson described Defendant as cooperative, responsive, and in good humor. Johnson did not ask Defendant if he was intoxicated or had taken drugs, but Defendant's speech and eye contact did not give Johnson any reason to ask. Defendant provided detailed information to Graham and Johnson, pinpointing a location of his methamphetamine manufacturing on a map, offering details of his pseudoephedrine purchases, and helping to draw a map to a residence. Johnson indicated he was able to find the residence based on Defendant's directions. Johnson gave Defendant instructions to contact him if he wanted to provide additional information and several days later, Defendant did contact Johnson.

Defendant testified he used methamphetamine and Xanax earlier in the day on January 2, 2010. He claims he typically used about one and a half grams of methamphetamine per day but sometimes used as much as five grams per day. He did not recall much of the evening and did not recall making any phone calls or anything about the traffic stop or the interview with law enforcement. He recognized his signature on the waiver form.

Defendant's family members provided testimony regarding their perception of Defendant's intoxication that evening. Dudley Rector, Defendant's grandfather, describes getting a call from Defendant between 8:00 and 10:00 p.m. and believing he was "drunk or drugged up" because he did

4

not make sense. Mr. Rector also received an additional call from Defendant at jail around 1:30 or 2:00 a.m. and describes Defendant sounding "crazy, like a drunk, drugged up." Defendant's mother, Margaret Smith, spoke with Defendant on the telephone in the afternoon on January 2, and Defendant was "tore out of his frame." When she saw Defendant on the evening of January 4, after his release, she could tell he was starting to come down. Defendant's sister, Amanda Wilson, described Defendant as "out there" and "delusional" when she drove him home on January 4. Finally, Defendant's cousin, Todd Graham, was also incarcerated when Defendant was brought in to the Marion County Jail. He tried to gesture to Defendant through a hallway window but Defendant did not recognize him and mouthed "I don't know you."

## II.  STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court must "make a de novo determination of those portions of the [R&R] to which objection is made" and "may accept, reject, or modify, in whole or in part," the magistrate judge's findings or recommendations. The Court has "broad discretion" in conducting a *de novo* determination and is not required to rehear witnesses whose testimony has been evaluated by the Magistrate Judge. *United States v. Raddatz*, 447 U.S. 667, 675-76, (1980). The Magistrate Judge, as the factfinder, had the opportunity to observe and hear the witnesses and assess their demeanor, which puts her in the best position to determine credibility. *Moss v. Hofbauer*, 286 F.3d 851, 868 (6th Cir. 2002); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). This assessment of witnesses' testimony is therefore entitled to deference. *United States v. Irorere*, 69 F. App'x 231, 236 (6th Cir. 2003).

## III.  DISCUSSION

The Magistrate Judge recommended denying Defendant's motion to suppress, finding the search of Defendant's vehicle was supported by probable cause and that Defendant knowingly and intelligently waived his *Miranda* rights. In his objections, Defendant reiterates his original arguments Graham lacked probable cause to detain him, to search his vehicle, and that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights before making any statements. Defendant claims the evidence presented of intoxication suggest a higher susceptibility to coercive police tactics and indicate "defendant's statements were not the product of a free and unconstrained choice at the time the defendant made any statements" (Court File No. 37, p. 3). Defendant also challenges Graham's credibility due to his failure to mention the distinctive odor associated with the manufacture of methamphetamine in his affidavit of complaint for Defendant's arrest or in his police report of the incident. Finally, Defendant claims Graham lacked probable cause for an arrest. Because Graham's testimony provides the facts surrounding the vehicle search and arrest, the Court will first address the challenge to Graham's credibility.

### A. Officer Graham's Credibility

Defendant claims Graham's testimony "lacked credibility in a subtle manner" (Court File No. 37, p. 2). Specifically, he claims Graham's failure to note the detail of the odors associated with methamphetamine in either his affidavit or police report. Defendant also describes Graham's responses regarding his failure to obtain additional paper for his affidavit as "evasive" (*id.* at 3). The Magistrate Judge referred to Graham's testimony as credible throughout the R&R. She noted the consistency between Graham and Johnson's testimony and credited "Graham's testimony regarding the methamphetamine odor in full" (R&R, p. 8). The Magistrate Judge also addressed Graham's omission of the detail of the methamphetamine odor from his paperwork as follows:

6

> An officer's otherwise credible, consistent, and unequivocal testimony that he smelled the odor of narcotics should not be overcome by negative inference. *See, e.g., United States v. Freeman*, 2010 WL 4244268 at * 8-9 (6th Cir. 2010). In *Freeman*, the officer testified he smelled marijuana at the suspect's vehicle, but on the video recording of the traffic stop, the officer did not mention the smell. The court held that "[t]he fact that [the officer] said nothing about the odor does not mean that he did not, in fact, smell marijuana." *Id.* Here, similarly, the fact that Graham did not mention the odor of methamphetamine does not mean that he did not, in fact, smell methamphetamine or methamphetamine-related chemicals. I therefore credit Graham's testimony in full.

(*Id.*).

Higher courts are "generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor." *Peveler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001), *accord United States v. Bailey*, 302 F.3d 652, 657 (6th Cir. 2002). Credibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted by a district judge unless in his *de novo* review of the record he finds a reason to question the magistrate judge's assessment. *Blizzard v. Quillen*, 579 F. Supp. 1446, 1449 (D. Del. 1984); *see also United States v. Brown*, No. 1:07-CR-9, 2007 WL 1345463, *1 (E.D. Tenn. May 7, 2007). In his paperwork, Graham did provide a list of items he observed in the vehicle and explained at the hearing, there was limited space for him to fully detail his observations. His testimony was also consistent with Johnson's description of events following the arrest. The magistrate directly observed Graham's and the other witnesses' testimony and provided a well-reasoned explanation for why she found him to be credible.

The Court concludes Graham's omission of the detail of the methamphetamine odor from his paperwork and explanation of space limitations are insufficient to undermine the Magistrate Judge's credibility determination.

**B.    Search of the Vehicle**

As described in Graham's unrebutted testimony, the traffic stop, vehicle search, and arrest were supported by probable cause. "An officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). Here, Graham testified he stopped Defendant for exceeding the speed limit. Although Defendant challenges Graham's probable cause to detain him, he does not appear to dispute the fact he was initially stopped for speeding (*see* Court File No. 37, p. 2 ("the defendant was stopped for speeding 85 miles per hour in a 55 mile per hour zone")). Based on Graham's observation of a traffic violation, his initial stop of Defendant was proper.

Officer Graham was entitled to effect the traffic stop, however, to detain Defendant beyond the issuance of a traffic citation, "the officer must have reasonable suspicion the individual has engaged in more extensive criminal conduct." *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). This "reasonable suspicion" began as Graham made his initial approach to Defendant's vehicle and detected an odor associated with the manufacture of methamphetamine. Such detection of a "narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle." *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008) (citing cases holding detection of odor of illegal substances provides probable cause); *United States v. Bohanon*, 629 F. Supp.2d 802, 809 (E.D. Tenn. 2009).

Defendant's reliance on *Arizona v. Gant*, 129 S.Ct. 1710 (2009), is misplaced. Graham was not searching Defendant's vehicle based solely on his traffic offense. Within moments of his first contact with Defendant to obtain Defendant's license and paperwork, Graham had probable cause to search the vehicle for evidence of unlawful drug activity. "A motorist has no expectation of privacy shielding that portion of the interior of an automobile which can be viewed from outside the

vehicle by either inquisitive passers by or diligent police officers." *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008) (quoting *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996)). In addition to the odor detected, Graham observed in plain view items commonly associated with the manufacturing of methamphetamine on the back seat and floor and Defendant had admitted to previous problems with methamphetamine. Officers are authorized to conduct a warrantless search of a vehicle if there is probable cause to believe a vehicle contains evidence of criminal activity. *Gant*, 129 S.Ct. at 1721 (citing *United States v. Ross*, 456 U.S. 798, 820-21 (1982)).[1]

Finally, based on the facts and circumstances, Graham had probable cause to believe "that an offense has been, is being, or will be committed" and a warrantless arrest was justified. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1508 (6th Cir. 1988) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Based on Graham's training and experience, he observed multiple items used in the manufacture of methamphetamine. A valid search of the vehicle yielded not only the items he initially observed, but also lithium batteries and coffee filters with white powder residue. Graham also noted the mason jar was covered in plastic secured by black electrical tape. These items are all associated with the manufacture of methamphetamine and a field test actually confirmed the presence of methamphetamine. Based on the materials Graham had observed and seized, it was reasonable to believe Defendant either had recently completed the manufacturing process or was soon to be engaged in the manufacture of methamphetamine. Graham therefore had probable cause to believe Defendant had been engaged in any one of several felony offenses related to the

---

[1] The Court agrees with the Magistrate Judge's reasoning on the issue of Defendant's consent to search the vehicle. Although Graham testified Defendant gave consent to search, the Court need not rely on this consent in light of the probable cause to search the car.

manufacturing of methamphetamine.[2]

Accordingly, the Court finds Graham's arrest of Defendant was proper and supported by probable cause.

### B. Waiver of *Miranda* Rights

Defendant moves to suppress statements made during his interview with Johnson following his arrest. He contends he did not exercise a proper waiver of his *Miranda* rights and his level of intoxication rendered him highly susceptible to police pressures. The Magistrate Judge concluded Defendant made a voluntary, knowing, and intelligent waiver of his rights and there was no evidence of improper police activity. The Court agrees.

The Fifth Amendment protects a person from being compelled to incriminate him or herself. *See, e.g.*, *Miranda v. Arizona*, 384 U.S. 436, 467 (1966). A suspect who is in custody and subject to interrogation must be given *Miranda* warnings against self incrimination. *Miranda*, 384 U.S. at 467-68. Because of the pressures and psychological stress exerted on those in custody, officers of the law are required to adequately and effectively apprise such individuals of their rights and must fully honor their decision should they seek counsel before answering questions. *Id.* at 467. If an individual agrees to answer questions without counsel, the officer can then question the individual freely. *Davis v. United States*, 512 U.S. 452, 458 (1994). The government bears the burden of establishing a waiver by the preponderance of the evidence. *United States. v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009) (citing *United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008)). A "waiver of *Miranda* rights must be voluntary that is, 'the product of a free and deliberate choice rather than

---

[2] *See, e.g.*, Tenn Code Ann. § 39-17-433 "Promotion of methamphetamine manufacture," § 39-17-435 "Initiation of a process intended to result in the manufacture of methamphetamine"

intimidation, coercion or deception.'" *Id.* (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). Such a waiver must also be "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Daoud v. Davis*, 618 F.3d 525, 529 (6th Cir. 2010) (citing *Moran*, 475 U.S. at 421).

Prior to any type of questioning, Johnson describes reading Defendant his *Miranda* rights as listed in the "Advice of Rights and Waiver" form and asking Defendant if he understood his rights. After Defendant answered in the affirmative, Johnson discussed the contents of the waiver section of this form and Defendant signed, acknowledging his intent to waive his rights (Court File No. 33-1). This form details the rights waived by the defendant and Defendant indicated he understood his rights and was willing to answer questions. Examining the facts and circumstances surrounding the questioning, there is no suggestion of coercive, intimidating or deceptive tactics. The defendant had prior experience with law enforcement from other convictions and even joked with Johnson about one of the prior incidents. He was not handcuffed during the interview and the officers had their weapons holstered. Defendant responded to Johnson's questions and provided information beyond what was asked. The Government bears the burden of establishing a valid waiver, but Defendant must point to some indication of improper police activity for the Court to find his confession was involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986)("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'") *accord United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989)(finding evidence of an impaired "cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary.").

The Court further finds Defendant's waiver was knowing and intelligent based on his prior experience with the law, his discussion with Johnson regarding the contents of the form, and his affirmative acknowledgment of understanding after reviewing the form himself. Defendant's intoxication without improper police activity, would not preclude a knowing and intelligent waiver as he was perceived to be "alert, coherent, and lucid" by the officers. *See United States v. Dunn*, 269 F. App'x 567, 573 (6th Cir. 2008). Even if Defendant was intoxicated, there is no indication the officers had reason to believe he was intoxicated or otherwise took advantage of his impairment. Johnson and Graham observed Defendant closely throughout the arrest and questioning and testified consistently regarding his demeanor. They describe his lack of slurred speech, his ability to maintain eye contact and respond to questions, and the level of detail he provided in describing the location where he manufactured methamphetamine, giving directions to a residence and helping to pinpoint a location on a map. In addition, when Defendant was initially booked, the booking officer did not place him in a "drunk tank" but put him in the general population of the jail.

The Court agrees with the Magistrate Judge's assessment of the conflicting testimony of Defendant's relatives (R&R, pp. 12-13 (reasoning it was possible they, who knew Defendant closely, "might have believed him to be intoxicated on the night of his arrest and in the ensuing days, but there is no evidence that Defendant failed to understand his rights or the consequences of relinquishing them or evidence of improper police activity")). Sometimes family members, close relatives, and others who know a person intimately are able to discern more subtle signs a loved one is impaired. Based on their own observations and experience with the defendant and the actions of the booking agent, the officers' failure to inquire in Defendant's sobriety was reasonable and does not demonstrate members of law enforcement took advantage of his "low ability to resist police

pressures."

Accordingly, the Court finds the defendant made a voluntary, knowing and intelligent waiver of his *Miranda* rights and his confession should not be suppressed.

**IV.     CONCLUSION**

For the above stated reasons, the Court will **ACCEPT** and **ADOPT** the Report and Recommendation (Court File No. 36) and will **DENY** Defendant's motion to suppress (Court File No. 23).

**An Order shall enter.**

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**